GEORGE AUGUST BELING

*v.*

THE AMERICAN TOBACCO COMPANY et al.

[Decided January 4th, 1907.]

After the filing of a consolidation contract between certain corporations, the business previously transferred by the constituent companies was carried on by the merged corporation as an entirety, and a large amount of the property received by the merged corporation had been sold, exchanged, or converted into other forms, and the receipts therefor had been so commingled that it became impossible to identify the same or to separate the business of the constituent corporations. Complainant, a stockholder in one of such corporations, made no objection to the merger until nearly six months after the merger agreement, during which time. the consolidated corporations' securities had been put on the market and were largely dealt in. It also appeared that complainant's assignor, who was the administrator of the record holder of the stock, had received notice of the meeting at which the merger agreement was entered into, and complainant when he acquired the stock had actual notice thereof, and bought the stock for the purpose of suing to set aside the consolidation.—*Held*, that complainant was not entitled to a decree vacating such merger agreement and requiring the officers of his corporation to resume possession of its assets and continue to transact its business.

Final hearing on bill and answer.

*Mr. Thomas L. Raymond* and *Mr. William. M. Seabury* (of New York), for the complainant.

*Mr. Richard V. Lindabury* and *Mr. Charles L. Corbin,* for the defendants.

PITNEY, V. C.

This is, in substance and effect, a bill for the specific performance of a continuing contract in writing, consisting of a certificate of capital stock, dated February 28th, 1894, issued by the then American Tobacco Company to one Fannie Soule, by which

it was certified that she was the owner of one hundred shares, of $100 each, of the preferred capital stock of the American Tobacco Company, which stock was entitled to dividends not exceeding eight per cent. for each year out of the net profits for such year, payable quarterly, in preference to the common stock, and also a preference on the assets of the company on the final distribution or division thereof (1940).

Fannie Soule, the beneficiary named in this certificate, died February 28th, 1895, and one J. Forbes Potter became the owner and holder of said certificate of stock by virtue of letters testamentary of the will of the said Fannie Soule, and held the said certificate until the latter part of the month of January, 1905, when he sold and assigned it to one Schalk, who held it until the 15th day of February, 1905, and on that day sold and assigned it to the complainant, Beling.

In the meantime the ownership of the stock stood on the books of the company in the name of the said Fannie Soule, and dividend checks were sent to her at her address, as recorded on those books, four times each year until the month of September, 1904. Those checks were presumably received by the executor and collected by him in the ordinary course of business.

The business of the American Tobacco Company, as declared in its articles of association, was

"to cure leaf tobacco, and to buy, manufacture and sell tobacco in all its forms, and to establish factories, agencies and depots for the sale and distribution thereof, and to transport, or cause the same to be transported, as an article of commerce, and to do all things incident to the business of trading and manufacturing aforesaid."

On the 9th day of September, 1904, the American Tobacco Company entered into an agreement of consolidation and merger with two other companies engaged in the tobacco business, to wit, the Continental Tobacco Company and the Consolidated Tobacco Company, to consolidate and merge those three companies into a new company, to be known as the American Tobacco Company, all the said corporations being New Jersey corporations, and said agreement of merger was afterwards approved by a meeting of the stockholders of the American

Tobacco Company held, after due and legal notice to each stockholder, on September 30th, 1904.

The agreement of merger was filed in the office of the secretary of state on the 20th day of October, 1904.

The proceedings were had in pursuance and by virtue of section 104 *et seq.* of the Corporation act of 1896 and the supplements thereto of April 10th, 1902. *P. L. p. 700; Dill. Private Corp.* (*4th ed.*) *128 et seq.*

The merger agreement provided that the new corporation, the present American Tobacco Company, should assume 'all the obligations of the old corporations, and provided for the satisfaction of the preferred stock of the old companies, amounting to $14,000,000, of which the complainant is the holder of $10,000, by the issuance of six per cent. bonds, maturing in 1940, the date of the expiration of the original American Tobacco Company's corporate existence, such bonds to be delivered to the holders of the preferred stock in the proportion of $13,333 of face value of the bonds to $10,000 of the face value of the stock, with a provision for fractions. So that complainant had the option to receive for his certificate of stock six per cent. bonds maturing at the time that his certificate of stock, so to speak, would have matured, which would produce him precisely the same income that his preferred stock, under the most favorable circumstances, could have produced him, and insure him at its maturity one-third more than its face value. Further, as appears by an examination of the consolidation agreement, the security for its payment would have been much better than that for the payment of dividends on his certificate of stock. Then comes the fact, distinctly alleged in the answer, that the market value of complainant's stock was at once increased as the result of the merger, so that presumably Potter received a greater price on his sale to Schalk than he otherwise could have received.

The only respect in which the holders of such preferred stock could have been the losers by the exchange was in the loss of the right, if any, to participate in the division of the surplus assets of the old American Tobacco Company, at its winding up in 1940, over and above sufficient to pay all classes of stock at par.

The question of this right so to participate was discussed at

length, but I do not deem it worth while to express a definitive opinion upon it, since it abundantly appears that the shares of common stock were more than three times the number of that of the preferred stock, and the control of the company was absolutely in the common stockholders, and the directors, being elected by the holders of the common stock, would naturally see to it, by the exercise of their power to declare dividends, that the preferred stockholders should receive no more than the par value of their stock at the end of the corporate existence of the company.

It sufficiently appears, from the pleadings, exhibits and schedules, that the property of the company is composed so much of general merchandise and of individual units quite susceptible of being sold in pieces as to present no obstacle to the consummation of what would almost necessarily be the natural desire of the common stockholders. And this circumstance makes the case a complete contrast to that of *Bridgewater Navigation Co., 39 Ch. Div. 1 (1888)*; *Birch* v. *Cropper, 14 App. Cas. 525 (1889)*, which is an authority relied upon in support of the proposition that preferred stockholders have an equal right with the common stockholders to share in surplus assets.

I am satisfied that the allotment of bonds to the complainant or his predecessor in ownership was a fair equivalent for his stock.

This offer, however, the complainant declined to accept, and by his bill charges that the whole proceedings to merge, though taken and carried through strictly according to the terms of the act of 1896, were absolutely void as to him and the then holder of his certificate of stock, for the reason that that act was passed after the organization of the original American Tobacco Company and after the issuance of the certificate of which he is now the owner.

His argument is the simple one so often advanced, viz., that his certificate of stock was a contract into which must be read the provisions of the Corporation act of the State of New Jersey at the time (1890) that the original American Tobacco Company was organized, and that no more than those provisions can be so read into it; that at that time it was not competent to

merge that particular corporation with any other corporation. Hence, he argues, the act of 1896 was absolutely void as to him and his contract, and the proceedings taken under it to merge were as to him absolutely void.

On this basis he prays that the whole proceeding may be set aside, and that the original American Tobacco Company may be compelled to transfer on the books of that company the one hundred shares of such stock to him, and that the merger agreement may be declared null and void as to the complainant and as to the assets of the original corporation, and that the merger itself may be declared to be void, and that the property of the original American Tobacco Company may be declared free and discharged of all liens, by mortgage or otherwise, made thereon since the merger, and that all such liens, as to the complainant, may be declared to be void, and that there may be an ascertainment, under the direction of this court, of the personal and real estate and other assets of the original American Tobacco Company at the time of the merger, and that the same may be separated from the property of the merged corporation and be redelivered to the officers and directors of the original American Tobacco Company, and that there may be an ascertainment of the amount of loss and damage sustained by the original company, and that a receiver may be appointed to take charge of all the property and assets of the American Tobacco Company, and to recover from the merged corporation all of the assets of the original company, and that a mandatory injunction may issue to compel the performance of the decree to be made by the court, and also for other relief.

With regard to any liens put upon the property by the new corporation, the inability of the court to grant the prayer in that behalf appears when we consider that no holder or trustee of any such lien is made party hereto.

A consideration of the wide sweep of the prayer and the task it asks the court to perform is sufficiently startling when we consider that the terms of the merger have been accepted by thirteen million eight hundred and eight thousand five hundred shares of the preferred stock out of a total issue of fourteen million, leaving only one hundred and ninety-one thousand five

hundred outstanding, and that all the other provisions of the merger for exchanging preferred stock of one or the other of the merger corporations for bonds of the new corporation and for the exchange of the stock of the old companies has been carried out to an extent equal in proportion to that of the preferred stock of the American Tobacco Company, and that the new bonds and new preferred stock of the merged company have been put upon the general security market and dealt in to a large extent, all before any notice to the defendants or public of the claim now made on behalf of the complainant by his bill.

The first notice was in a letter dated March 4th, 1905, nearly six months after the merger agreement, and it appears that in the meantime not only had these securities been put upon the security market in New York, but, as appears by the answer, after the filing of the merger contract, October 20th, 1904, the business theretofore carried on by the three constituent companies separately has been carried on by the merged corporation as an entirety; that a large amount of the property received by the merged corporation from the constituent companies had been sold, exchanged or converted into other forms, and the receipts therefor have been so commingled that it became impossible to either identify or separate the same, and that the funds in general have been so commingled and otherwise disbursed in the general course of business that it was impossible at the time the complainant's bill was filed to restore the affairs of the company to their original condition.

Before considering the question whether the court, under such circumstances, ought to undertake to grant the prayer of the bill, it is necessary to notice a point made by the defendants.

The complainant in his bill, apparently feeling that the point would be made against him that his predecessors in title had been guilty of laches, alleges that Potter, the previous holder,

"received no notice of the said alleged meeting of the stockholders held on the 30th day of September, 1904, and that he had never voted on said stock at any time upon any proposition presented to the stockholders to be voted on, nor had he at any time given any proxy to any person to vote for him; * * * that he received no notice from the officers of said company, or from any other source whatsoever, of the said merger agreement or its proposed adoption; * * * that all the proceedings taken to

carry out said merger was done without the knowledge, connivance or consent of Potter, and that he was never notified of the closing of the books of the original American Tobacco Company until the month of February, 1905,"

and it alleges the same as to Schalk, the intermediate owner between Potter and the complainant, and it then says that complainant himself has never given his consent by word or act to the merger.

This allegation, it will be observed, is of a fact or series of facts not within the knowledge of the defendants, and therefore not admitted by a failure to deny.

The complainant in his argument makes the cardinal mistake of presuming that, because these allegations are not specifically denied by the answer, they must be taken to be admitted. But this is not the rule. If no answer at all had been filed and a decree *pro confesso* taken, that decree would not have availed the complainant to the extent of entitling him to a final decree. By the well-settled practice of the court he would have been obliged to adduce proofs *ex parte* to sustain every material allegation in his bill.

It appears, however, by the answer that, as already stated, the stock all the while stood on the books of the company in the name of Mrs. Soule, and that the regular quarterly dividends had all the time been sent to her at the address found on the books of the company in connection with her name as a stockholder. And then, in answer to the specific allegation of non-notice to Potter of the proceedings in merger, the answer states that the defendants have no knowledge as to what notice J. Forbes Potter had of said merger agreement or of the stockholders' meeting called to ratify the same, but says that notice of said meeting and a copy of said agreement were mailed to the said Fannie Soule at her post-office address given on the books of the company, which is the same address at which notices of every other stockholders' meeting have been sent to her since the said stock was transferred to her in 1894. Then further on is another allegation charging Potter with actual notice through the public prints, wherein it was widely discussed.

Now these allegations, taken in connection with the fact that dividend checks were sent to Mrs. Soule four times a year, and that it appears by the exhibit annexed to the bill that at least two stockholders' meetings were held between 1895 and 1903, and the fact that it does not appear that Potter has ever complained that he did not receive his dividends, amounts to an averment of facts from which I feel bound to infer that Potter did receive actual notice of the meeting of September 30th, 1904.

Counsel for the complainant made the mistake in his argument of supposing that the positive allegation in the bill of nonnotice to Potter, unless explicitly denied, stood as if proven, but, as before observed, this is incorrect. That rule applies only to allegations of matters within the knowledge of the defendants, and the defendants' answer herein to the allegation put the complainant on proof of non-notice, the right to make which proof he waived by going to hearing on bill and answer.

I must therefore hold that Potter did have actual notice of the meeting of September 30th, 1904. And certainly if he did not it was his own fault and not that of the defendants, since he permitted the ownership of the stock to stand on the books of the company all these years in the name of his testatrix at her original address.

The answer further alleges:

"This defendant alleges, however, that both the said Rudolph Schalk and the said complainant had notice of the said merger before they acquired the said stock, and the said stock was acquired by them not as an investment, but for the sole purpose of bringing such a suit as the present one."

Now, this allegation, distinctly made in the answer, is admitted by the complainant.

Before considering its effect one other fact set up in the answer and likewise admitted is worthy of notice, namely, that at the meeting of September 30th one million one hundred and fifty-eight thousand nine hundred and thirty-four shares of both classes of stock out of a total of one million two hundred and thirty thousand outstanding were present or represented by proxy, and of those so present one million one hundred and fifty-seven thousand two hundred and fourteen shares voted for the

adoption of said agreement and seven hundred and twenty shares voted for the rejection of the same.

It thus appears that nearly ninety-five per cent. of all the shares voted in favor of the merger, and of those actually voting nearly ninety-nine per cent. voted in favor of it.

Now, taking all these circumstances together, and the fact that the agreement has been acted upon to the extent I have previously mentioned, and the extreme difficulty, if not the impossibility, of practically granting the complainant the relief he asks, and that the old American Tobacco Company has practically ceased to exist, the question arises whether, admitting to the fullest extent the complainant's legal right, this court ought to attempt to grant him the relief he asks for. That relief amounts to a decree for the specific performance of the contract implied in the certificate of stock that the American. Tobacco Company would, by its regular organization, its directors and officers, proceed to carry on the business provided for in its certificate of organization until the end, in 1940, of the term of its existence, also provided for.

Now, in order to carry out that agreement as prayed for, it will be necessary not only to perform the well-nigh impossible task of taking the account previously mentioned, but also to revivify the old company, whose existence was ended by the merger agreement, by calling the stockholders together to elect a new set of directors, after those stockholders have surrendered all their stock and taken in its place new stock and bonds in the new company in pursuance of the elaborate scheme set forth in the merger agreement, and, if they fail to do so, to submit the old company to the management of the small fraction of the stockholders of the old company who may yet have refrained from accepting the securities provided for them by the merger agreement.

Now, I conceive that the case presented is one in which the court is thoroughly justified in refusing to give specific performance.

It is well settled that the court will not, in all cases, grant specific performance. It is always, in a sense, a matter of judicial discretion. The difficulty of specifically performing the con-

tract and its effects and consequences to the parties, the comparative injury to the one party and the benefit to the other, are to be taken into consideration.

The latest illustration of this rule is found in *Speer* v. *Erie Railroad Co., 68 N. J. Eq. (2 Robb.) 619.* The subject is touched upon by Professor Pomeroy (*Pom. Spec. Perf.* § *303 et seq.*), and the general subject is dealt with in section 36 *et seq.*

I shall not go into the authorities, and will content myself with saying that this is a case in which the court ought not to assist the complainant to the extent which he asks.

The complainant's assignor, Potter, is chargeable with negligence in not coming forward and asserting his rights in time to have prevented the merger from being so far carried out as to render it practically impossible to grant the relief which he asks.

This view renders it, perhaps, unnecessary to take notice and pass upon another point made by the defendant, and that is that while the act of 1896, providing for a merger, was not in existence at the time the original company was organized, the law then in force did provide for the winding up of a company before the time provided for in its charter or certificate of organization, and that this agreement of merger amounted to a winding up of the old company.

The act then in force was that of April 7th, 1875 (*Rev. p. 175*), which in the seventh subdivision of the first section gives express power to any corporation to wind up and dissolve itself or be wound up and dissolved in the manner thereinafter mentioned. The provisions for dissolution are found in the thirty-fourth section of that act on pages 182 and 183. This section was slightly amended by the act of February 21st, 1877 (*P. L. p. 20*), and this section was substantially re-enacted by the act of 1896, section 31. *Dill. Mun. Corp. 51.*

Now, the existence of this act shows clearly the fallacy of the complainant's argument that, by the contract, he is entitled to have the old company carried on until the time limited in its original certificate of organization, and it meets and disposes of many of the *dicta* cited in his argument and relied upon to support his position. That right to have the business carried on

until the natural death of the corporation is subject to the will of the majority of two-thirds provided for in the statute.

Now, while the merger proceedings here attacked do not amount, strictly speaking, to a legal winding up, their effect was, in substance, precisely the same, and the only difference to the complainant is that he did not receive the share of the proceeds of the winding up which he would have got under formal proceedings under the statute.

But the large vote for the merger shows conclusively that, if the winding-up proceedings had been necessary, they would have been taken and pursued to the end, and it further indicates, with sufficient certainty for present purposes, that if the decree asked for by the complainant were granted, its practical effect to the complainant would be immediately met by formal winding-up proceedings.

The complainant argues with great force that the negligence or laches of his predecessor in title cannot, upon any legal or equitable principle, be extended so far as to forfeit his rights. Granting the general proposition to be as claimed by him, yet the complete answer is that the refusal to grant his decree does not work any forfeiture of his rights, but simply has its weight, in connection with other circumstances in debarring him from the special and extraordinary relief which he is asking. For it must be borne in mind that not a single stockholder of those who appeared at the meeting did anything more than vote against the merger; no formal protest was made or proceeding taken to prevent the merger; the small minority quietly acquiesced in the action of the great majority, and that majority, acting on that acquiescence, proceeded with the merger, and so far altered the situation as to render it now well-nigh impossible to grant the relief asked for by the complainant.

Complainant relies as a precedent for his decree upon the familiar cases of *Kean* v. *Johnson, 9 N. J. Eq. (1 Stock.) 401; Zabriskie* v. *Hackensack Railroad Co., 18 N. J. Eq. (3 C. E. Gr.) 178; Black* v. *Delaware and Raritan Canal Co., 22 N. J. Eq. (7 C. E. Gr.) 416,* and *Mills* v. *Central Railroad Co., 41 N. J. Eq. (14 Stew.) 1.*

The principles established by those cases do undoubtedly apply

here, but neither of them are precedents for the relief asked for in the present case. In the first place, the subject-matter of the contract was, in each case, quite different, as well as the character of the business carried on from that in this case. The subject-matter was a unit which had a continued existence in its original condition and was incapable of daily change in form or substance. In neither case had that form and substance been changed or the mode of its use altered. In the *Black Case* and in the *Zabriskie Case* the remedy asked for was purely one of restraint against the consummation of a proposed change in the contract. In the *Mills Case* the relief prayed for was simply to set aside a lease of the subject-matter and was accomplished without the least disturbance of the operation of the subject-matter. And Mr. Mills had attended the meeting and voted against the lease. In the case of *Kean* v. *Johnstone* the prayer went a little farther, but not so far as asked for here. It did not in anywise disturb the existence or operation of the subject-matter. It simply prayed an account of the property of the original road under the new organization, and that the purchase complained of and the bonds and mortgages issued might be declared void, and for an injunction against further issue of bonds and mortgages. The cause was heard on general demurrer to the equity of the bill. No mortgagee or holder of any of the bonds was made a party, and there was no demurrer for want of parties. The demurrer was simply overruled, and no further proceedings were ever had in the cause, so far as the records of the court show. So that the case is not a precedent for the decree here asked for.

Counsel were unable, as I must presume, to produce any case where a decree like that asked for here has been made by a court of equity.

Defendant offers to pay complainant in cash the market value of his stock at the time of the consolidation or the present worth of his stock, with all dividends that can be possibly received thereon up to the expiration of the old charter, meaning by this last the value of the coming payments discounted. Of course, complainant can have the six per cent. bonds originally allotted to him.

The only decree other than that offered by the defendant, which I have been able to conceive can be properly made in favor of the complainant in this cause, is a decree for the payment quarterly of the eight per cent. dividend on the amount of the stock from the date of the last payment up to the termination of the charter of the old company and the payment of the par value of the stock at that time. Such a decree was not suggested at the argument, and I am not ready, without argument, to say that I will advise it. I am willing, if complainant shall so wish it, to hear argument on the propriety of such a decree. If he does not wish it, I must advise that his bill be dismissed without prejudice to his right to his action at law, which, in my judgment, is ample to give him the full value of his stock at the time of the merger. If the complainant chooses to accept either of the offers made by the defendant in its answer, a proper decree will be advised, without costs.